HERBERT SAWIN *vs.* CONNECTICUT VALLEY STREET RAILWAY COMPANY.

Franklin.   October 3, 1912. — November 25, 1912.

Present: RUGG, C. J., MORTON, HAMMOND, BRALEY, & DeCOURCY, JJ.

*Negligence,* Street railway. *Street Railway. Way,* Public. *Practice, Civil,* Rulings and Instructions.

An action against a street railway company by a passenger for personal injuries received in an accident caused by the giving way of a culvert maintained by a town under a highway upon which the defendant's railway was constructed was heard by a judge without a jury, who ruled that the defendant "was bound to maintain beneath its tracks within the highway over the culvert such structure or foundation as to enable it to run cars safely thereover in the event that the town . . . failed so to do," and found for the plaintiff. On exceptions by the defendant this ruling was interpreted to mean, not that the defendant was bound to guard against every conceivable emergency, but that it was bound to discharge the obligations of a common carrier in regard to the foundations of its tracks, and that it did not discharge such obligations by relying upon the town and its officers to do their duty as to the culvert, and, so interpreted, the ruling was *held* to be correct.

The grant to a street railway company of the privilege of laying tracks and running cars upon a highway for the transportation of passengers by necessary implication includes the power and imposes the obligation to construct and maintain within the limits of the highway such foundations and supports as are required for the reasonable conduct of its business and the safety of its passengers.

RUGG, C. J.   This is an action of tort to recover damages for injuries sustained by the plaintiff while a passenger upon a car of the defendant. The accident occurred in the town of Montague, at a place where the defendant's tracks had been constructed in accordance with a location duly granted within the limits of the highway, but on its side and not within its wrought portion.

The cause of the accident was the giving way of a culvert in consequence of a heavy rain following a severe snow storm. This culvert had existed long before the construction of the defendant's tracks, and had been maintained by the town of Montague, except that since the laying of the defendant's tracks in 1896 it had been washed out twice, and thereafter had been enlarged and lengthened, to the expense of which by agreement the defendant contributed. The culvert was wholly within the highway. Its dimensions were determined by the town authorities, and it carried the surface water from a considerable territory lying outside the highway. The immediate cause of the accident was the flowing of water over the highway and tracks of the defendant by reason of obstruction of the culvert by ice. In previous years the town had kept the culvert clear, but did not do so during the year of the accident, although the defendant had no knowledge of any change in its practice. Water upon and over the tracks of the defendant was not unusual. Upon these facts the Chief Justice of the Superior Court "found as matters of fact that the defendant company was not negligent in regard to the condition of its car tracks or power nor in the management of its car at the time of the accident, but, however, ruled that the defendant company was bound to maintain beneath its tracks within the highway over the culvert such structure or foundation as to enable it to run cars safely thereover in the event that the town of Montague failed so to do." Having made these findings and this ruling, he found for the plaintiff. The defendant's exception to the ruling brings the case here.

This ruling is interpreted to mean that the defendant was bound to discharge the obligations of a common carrier touching the foundations of its tracks, not that it was absolutely bound to guard against every conceivable emergency, and that it did not discharge such obligations by relying upon the town and its officers to do their duty as to the culvert.

There is nothing in the record to indicate that there were terms or conditions in the original location granted to the defendant, by which it was bound to do anything as to the culvert. Reasons which might apply under such circumstances, therefore, may be laid on one side. See *Selectmen of Gardner* v. *Templeton Street Railway,* 184 Mass. 294; *Selectmen of Wellesley* v. *Boston &*

*Worcester Street Railway,* 188 Mass. 250; *Mayor & Aldermen of Worcester* v. *Worcester Consolidated Street Railway,* 192 Mass. 106; *Selectmen of Clinton* v. *Worcester Consolidated Street Railway,* 199 Mass. 279. The point now presented for decision has never before arisen in this Commonwealth. It has nothing to do with the repair of the surface of highways for general travel. Cases like *Leary* v. *Boston Elevated Railway,* 180 Mass. 203, and *Hyde* v. *Boston,* 186 Mass. 115, have no bearing.

The precise point is the extent to which a street railway company is required in the performance of its duty as a common carrier of passengers to provide for the support of its track and the extent to which it may rely upon the public authority in this regard. The obligation to its passengers in justice can be no more extensive than its power to provide adequate foundations. In reason, the street railway company cannot be held to a degree of liability higher than it can provide against in the exercise of its right. The statutes make no definite provision upon the subject. The board granting the location is empowered to "prescribe how the tracks shall be laid, and the kind of rails, poles, wires and other appliances which shall be used, and " as to matters not treated in the general provisions of law in addition may "impose such other terms, conditions and obligations, incidental to and not inconsistent with the objects of a street railway company, as the public interests may in their judgment require." St. 1906, c. 463, Part III, §§ 7, 64, 65, as amended by St. 1909, c. 417, §§ 1, 2, 3. The laying of tracks, in a broad sense, includes the preparation of proper foundations to support the weight of the rails, cars and loads carried, as well as the amount and character of ballast to be used and the size and type of rails and the nature of their binding. By St. 1906, c. 463, Part III, § 79, a street railway company is authorized to "open any street, highway or bridge in which any part of its railway is located, for the purpose of making repairs or renewals," and the officer having charge of streets is required to issue permits therefor. The fair implication from the language of the statute is that, in addition to the express requirements of the public board as set forth in the location, the company may satisfy the reasonable needs of its business in the respects pointed out, both in original construction and in subsequent repairs.

Broader considerations lead to the same conclusion. The street railway company is an instrumentality for the accommodation of public travel. As a common carrier of passengers, it is bound to exercise the utmost diligence consistent with the nature and extent of its business and its practical operation for the safety of those whom it undertakes to transport. It is authorized to use instrumentalities denied to the ordinary traveller upon highways. Its cars are as matter of common knowledge far heavier than vehicles for which municipalities are required by law to maintain highways in safety. The teams and carriages, for the safe and convenient passage of which by travellers the highways must be kept in repair under R. L. c. 51, § 1, are confined to the same general kind in use when the statute first was enacted, and do not include electric cars. *Doherty* v. *Ayer*, 197 Mass. 241. Moreover, the weight of carriage for which liability exists on the part of a city or town for failure to repair does not exceed six tons (R. L. c. 51, § 18), a weight much less than that of the electric car in common use. If in other respects the way is safe and convenient for the ordinary traveller, it does not become out of repair merely because not safe for such an instrumentality of travel as an electric car. The duty of the public authority toward the traveller in the street car is different from that assumed by the common carrier toward its passenger transported for hire.

The location of a street railway within the limits of a public way imposes upon the city or town no obligation toward the street railway company of changing the way so that it may be fit and convenient for the construction and maintenance of tracks, poles or other appliances for the operation of the railway. The company in this respect takes the street as it finds it, and must make it suitable to its needs without the aid of the municipality. If by reason of the grade of the streets, the character of its soil or the presence of other structures in it, a necessity arises to make special and peculiar adaptations in order to repair the roadbed or construct its railway, this work devolves upon the company, and not upon the public authority. A consideration of other kinds of corporate structures in streets confirms this view. A telegraph or telephone company, given a right to set up and maintain a line of poles in public ways, cannot require the municipality to make firm ground of a swamp along a roadside. The company must

prepare such strength of. support as the weight superimposed upon its poles may need. Nor can it demand a cutting of the underbrush or trimming of trees at the expense of the city or town in order that the wires may be strung from pole to pole. Public service corporations may be permitted to lay conduits and pipes beneath the surface of public ways under numerous statutes. If in the course of excavation for such purpose quicksand should be encountered, the municipality could not be compelled to overcome this obstacle in order that a secure foundation be afforded for the conduit or pipe.

A street railway company acquires by its location a right in the nature of a license to occupy portions of the street for purposes of its travel. As to the preparation of the place where the license is to be exercised, it stands upon no higher ground than other licensees. Its right is a peculiar privilege to modify to some extent the use of the public way, and by such modifications to enjoy in common with others the easement of public travel, according to· the limitations and advantages which accrue from the employment of rails and cars. *Attorney General* v. *Metropolitan Railroad*, 125 Mass. 515. *Union Railway* v. *Mayor & Aldermen of Cambridge*, 11 Allen, 287. It obtains no right of private property in the soil of the street. *Connecticut Valley Street Railway* v. *Northampton, ante,* 54. *New England Telephone & Telegraph Co.* v. *Boston Terminal Co.* 182 Mass. 397. *Lorain Steel Co.* v. *Norfolk & Bristol Street Railway,* 187 Mass. 500. In many parts of the Commonwealth locations have been granted upon the side of the road to street railway companies. It has been the practice under these circumstances for the railway company to make such clearing of obstructions, changes in the grade, blasting of ledges, construction of culverts, fitting of foundations and preparation of ballast as its necessities demand, at its own expense and without cost to the city or town. Indeed, the right of the street railway company to do this is recognized in *Worcester* v. *Worcester & Holden Street Railway,* 194 Mass. 228. See also *Hyde* v. *Boston & Worcester Street Railway,* 194 Mass. 80; *Laroe* v. *Northampton Street Railway,* 189 Mass. 254; *Underwood* v. *Worcester,* 177 Mass. 173. It appears to be authorized as to ways proposed for State highways by St. 1909, c. 417, § 4.

The power to establish the necessary supports to make safe its traffic is implied from the nature and purpose of the location of the street railway. It comes within the generalization of Chief Justice Shaw respecting the location of a horse railroad, in *Commonwealth* v. *Temple*, 14 Gray, 69, 77: "Every grant, by an obvious and familiar rule of law, carries with it all incidental rights and powers necessary to the full use and beneficial enjoyment of the grant; and where such grant has for its object the procurement of an easement for the public, the incidental powers must be so construed as most effectually to secure to the public the full enjoyment of such easement." Although the Legislature has changed the obligation of street railway companies touching the care of the streets for other travel than its own from time to time, and finally has abrogated it altogether in most instances, this comprehensive statement of the law never has been limited.

The grant to a common carrier of passengers of the privileges of laying tracks and running cars for transporting the public, and thus facilitating the easement of travel, carries with it by necessary implication the right to establish such foundations and supports within the limits of the street as are required by the reasonable conduct of its business and the safety of its passengers. This implied power must be exercised in accordance with such terms as the board granting the location may impose under the statute. Where terms of the location are silent or not specific, the power must be exercised with a reasonable regard to the rights of others and of the general public. But it exists and must be exercised before the street railway company can be said to have discharged its obligation to its passengers. In the absence of any evidence as to the terms of the location, it cannot be assumed that the public authorities in granting it would hamper the power and duty of a street railway company to make its track safe. A street railway company voluntarily assumes to be a common carrier of passengers within public streets and highways. It may accept or renounce the onerous burdens imposed upon it as such with knowledge of the conditions under which they must be performed. The street railway company stands on a different basis in this regard from other common carriers upon highways, such as owners of coaches, stages or automobiles. These are given no special privileges in the streets, and must use

the surface as provided by the public. But street railway companies possess extensive rights denied to other travellers, as to size and weight of vehicles employed, as to route of travel and powers of doing work, and as to their track within the limits of the way, and may be held to a correspondingly larger obligation.

There is nothing inconsistent with this view in *Birmingham* v. *Rochester City & Brighton Railroad,* 137 N. Y. 13, which had to do with an accident occurring upon a bridge spanning a canal, over which as matter of law the railroad company could exercise no control, and over which it must pass on the same terms as any other traveller. See *Indianapolis* v. *Cauley,* 164 Ind. 304; *Elgin, Aurora & Southern Traction Co.* v. *Hench,* 132 Ill. App. 535. This judgment does not define the obligations of street railway companies as to bridges, which may be built under special statutes and with varying obligations and conditions attached to their construction, maintenance and repair.

The result is that, as the defendant possessed the power to construct such supports within the limits of the highway as would render its railway safe for the discharge of the duties resting upon it as a common carrier of passengers, it may be held liable in this action.

*Exceptions overruled.*

The case was submitted on briefs.
*F. L. Greene & F. N. Thompson,* for the defendant.
*F. J. Lawler,* for the plaintiff.