# COMMONWEALTH *vs.* GENEVIEVE WELOSKY.

Suffolk.  May 19, 1931. — September 9, 1931.

Present: RUGG, C.J., CROSBY, CARROLL, WAIT, & FIELD, JJ.

*Jury and Jurors.  Constitutional Law,* Equal protection of laws, Opinions of the justices, Trial by jury.  *Statute,* Construction.  *Intoxicating Liquor.  Evidence,* Competency, Relevancy, Of motive.  *Practice, Criminal,* Requests, rulings and instructions, Exceptions.

Opinions rendered by the justices of this court under c. 3, art. 2, of the Constitution of the Commonwealth, although necessarily the result of judicial examination and deliberation, are advisory in nature, given by the justices as individuals in their capacity as constitutional advisers of the other departments of government and without the aid of arguments, are not adjudications by the court, and do not fall within the doctrine of *stare decisis;* when the same questions are raised in litigation, the justices then composing the court are bound sedulously to guard against any influence flowing from the previous consideration, to examine the subject anew in the light of arguments presented by parties without reliance upon the views theretofore expressed, and to give the case the most painstaking and impartial study and determination that an adequate appreciation of judicial duty can impel.  Per RUGG, C.J.

Statements by RUGG, C.J., of the general principles underlying the construction of statutes.

The scope of R. L. c. 176, § 1, (now G. L. c. 234, § 1,) was not extended by the ratification in 1920 of the Nineteenth Amendment to the Constitution of the United States so as to include women and to render them liable for jury duty; nor was the scope of G. L. c. 234, § 1, so extended by the adoption of the principle contained in said amendment as manifested by the approval in 1924 of art. 68 of the Amendments to the Constitution of the Commonwealth.

Upon examination of the proceedings incident to the enactment of the General Laws, it was *held,* that, although such enactment occurred subsequent to the ratification of the Nineteenth Amendment to the Constitution of the United States, the General Court did not intend that c. 234, § 1, containing substantially the same language as that previously used to describe those liable to service as jurors, should include women.

Under the statutes of the Commonwealth in force in 1930, construed in the light of relevant constitutional provisions, women were not eligible to jury service, and the preparation of jury lists from which only men were drawn for service upon juries was proper.

The trial of a woman by a jury drawn from lists from which women were excluded does not deny to the woman equal protection of the

laws within the meaning of the Fourteenth Amendment to the Constitution of the United States, nor a trial by judgment of her peers as required by art. 12 of the Declaration of Rights; nor does it violate 18 U. S. Sts. at Large, 336, § 4.

A replication by the Commonwealth, at the trial of a complaint against a woman, to a challenge to the array by the defendant on the ground that the jurors were drawn from lists from which women were excluded, properly was sustained.

Upon exceptions saved by the defendant at the trial of a complaint charging the defendant with keeping and exposing intoxicating liquor with intent unlawfully to sell the same, it was *held*, that

(1) Testimony as to observations by the witness, a police officer, touching the tenement occupied by the defendant and as to the number and sobriety of persons going to and coming from it was relevant and properly was admitted;

(2) Questions by the defendant to a police officer as to his reasons for not arresting intoxicated men whom he saw leaving the defendant's house, for not making a complaint against the defendant for manufacturing intoxicating liquor, and as to the impression he desired to convey, were rightly excluded;

(3) Competent testimony by a witness for the Commonwealth, although not responsive to a proper question by the district attorney, properly was admitted: if the defendant had desired to have the answer struck out as irresponsive, he should have made a motion to that effect;

(4) The motives of police officers in conducting raids on premises of the defendant were immaterial on the question of the guilt of the defendant;

(5) Exceptions to refusals to give rulings which were covered adequately by a complete, accurate and impartial charge to the jury must be overruled.

COMPLAINT, received and sworn to in the District Court of Chelsea on July 9, 1930, charging the defendant with keeping and exposing intoxicating liquor with intent unlawfully to sell the same.

Upon appeal to the Superior Court, the complaint was tried before *Hayes*, J., a judge of a district court sitting in the Superior Court under statutory provisions. The defendant's challenge to the array is described in the opinion. The judge sustained a replication by the Commonwealth thereto. The defendant was found guilty and alleged exceptions.

*E. M. Shanley*, (*G. E. Roewer* with him,) for the defendant.

*W. J. Foley*, District Attorney, & *F. J. Hickey*, Assistant District Attorney, for the Commonwealth, submitted a brief.

*G. C. Coleman* & *O. Slater*, for Massachusetts League of

Women Voters, by leave of court, submitted a brief as *amicae curiae*.

RUGG, C.J.   As the jurors were about to be empaneled for the trial of this complaint, the defendant filed a challenge to the array. Issue of law was joined thereon. *Commonwealth* v. *Walsh*, 124 Mass. 32, 35. *Provident Institution for Savings* v. *Burnham*, 128 Mass. 458, 461. The ground on which that challenge rests is that there were no women on the lists from which the jurors were drawn. The contention in support of the challenge raises two inquiries: (1) whether under the laws of the Commonwealth the names of women ought to have been placed upon the jury lists; and (2) whether by such exclusion the constitutional rights of the defendant under the Fourteenth Amendment to the Constitution of the United States have been infringed.

Both these questions were answered in the negative by the justices in an opinion rendered to the Honorable the House of Representatives in accordance with the duty imposed by c. 3, art. 2, of the Constitution. *Opinion of the Justices*, 237 Mass. 591. It has been uniformly and many times held that such opinions, although necessarily the result of judicial examination and deliberation, are advisory in nature, given by the justices as individuals in their capacity as constitutional advisers of the other departments of government and without the aid of arguments, are not adjudications by the court, and do not fall within the doctrine of *stare decisis*. When the same questions are raised in litigation, the justices then composing the court are bound sedulously to guard against any influence flowing from the previous consideration, to examine the subject anew in the light of arguments presented by parties without reliance upon the views theretofore expressed, and to give the case the most painstaking and impartial study and determination that an adequate appreciation of judicial duty can impel. *Green* v. *Commonwealth*, 12 Allen, 155, 164. *Young* v. *Duncan*, 218 Mass. 346, 351, and cases cited. *Perkins* v. *Westwood*, 226 Mass. 268, 272, and cases cited. *Loring* v. *Young*, 239 Mass.

349, 361. *Inspector of Buildings of Lowell* v. *Stoklosa*, 250 Mass. 52, 59.

1. The first question to be decided is whether the statutes of this Commonwealth require that the names of women otherwise qualified be placed upon jury lists so that they may be drawn for service as jurors.

It is plain that women could not rightly serve as jurors, save in the rare instances where a jury of matrons was called, under the Constitution and laws of this Commonwealth prior to the adoption of the Nineteenth Amendment to the Constitution of the United States. The terms of the statute, in the light of the Constitution, express decisions, universal understanding, and unbroken practice, forbid any other view. The trial by jury of the common law and that contemplated by both the Constitution of this Commonwealth and that of the United States were by a jury of twelve composed exclusively of men. *Commonwealth* v. *Dorsey*, 103 Mass. 412, 418. *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 13.

The statute to be interpreted is G. L. c. 234, § 1. Its relevant language is: "A person qualified to vote for representatives to the general court shall be liable to serve as a juror," with exceptions not here material.

The words of a statute are the main source for the ascertainment of a legislative purpose. They are to be construed according to their natural import in common and approved usage. The imperfections of language to express intent often render necessary further inquiry. Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part, and in the light of the Constitution and of the common law, to the end that they be held to cover the subjects presumably within the vision of the Legislature and, on the one hand, be not unduly constricted so as to exclude matters fairly within their scope, and, on the other hand, be not stretched by

enlargement of signification to comprehend matters not within the principle and purview on which they were founded when originally framed and their words chosen. General expressions may be restrained by relevant circumstances showing a legislative intent that they be narrowed and used in a particular sense. *Robinson's Case,* 131 Mass. 376, 377. *Simpson* v. *Story,* 145 Mass. 497, 498. *Duggan* v. *Bay State Street Railway,* 230 Mass. 370, 374, and cases cited. *Zoulalian* v. *New England Sanatorium & Benevolent Association,* 230 Mass. 102, 105.

It is clear beyond peradventure that the words of G. L. c. 234, § 1, when originally enacted could not by any possibility have included or been intended by the General Court to include women among those liable to jury duty. The Constitution forbade the words, "A person qualified to vote for representatives to the general court," to comprehend women. Women have been qualified to vote in this Commonwealth only since the adoption of the Nineteenth Amendment to the Constitution of the United States. It is not argued in behalf of the defendant that the terms of the statutes preceding G. L. c. 234, § 1, that is to say of R. L. c. 176, § 1, and its predecessors in substantially the same words since a time before the adoption of the Constitution, could possibly have imposed jury duty upon women. The argument on this point is twofold: (A) that the phrase of the statute is general and therefore was intended automatically to include women if their constitutional inhibitions were ever removed; and (B) that, since the General Laws were enacted in December, 1920, after the ratification of the Nineteenth Amendment, the statute was intended to include women. These arguments will be considered in turn.

A. The Nineteenth Amendment was, on August 26, 1920, proclaimed to have been duly ratified. That amendment declared that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of sex." It became forthwith binding upon the people and the several departments of this Commonwealth. By its own self-

executing force it struck from the Constitution of this Commonwealth the word "male" wherever it occurred as a limitation upon the right to vote. See arts. 3 and 32 of Amendments to the Constitution of the Commonwealth. *Opinion of the Justices*, 240 Mass. 601, 605. *Guinn* v. *United States*, 238 U. S. 347, 362, 363. *Leser* v. *Garnett*, 258 U. S. 130. The subsequent approval by the people of this Commonwealth on November 4, 1924, of art. 68 of the Amendments to the Constitution of Massachusetts, whereby the word "male" as a limitation upon the right of citizens to vote was stricken from art. 3 of the Amendments as amended, simply manifested the people's adoption of that principle and made our Constitution harmonious in phraseology with that of the United States; but it had no legal effect upon the right of women who were citizens of Massachusetts to vote. That had already been fixed indubitably by the ratification of the Nineteenth Amendment to the Constitution of the United States.

Statutes framed in general terms commonly look to the future and may include conditions as they arise from time to time not even known at the time of enactment, provided they are fairly within the sweep and the meaning of the words and falling within their obvious scope and purpose. But statutes do not govern situations not within the reason of their enactment and giving rise to radically diverse circumstances presumably not within the dominating purpose of those who framed and enacted them. *Richardson* v. *Danvers*, 176 Mass. 413, 414. *Doherty* v. *Ayer*, 197 Mass. 241, 244–246. *Commonwealth* v. *Goldman*, 205 Mass. 400. *Sawin* v. *Connecticut Valley Street Railway*, 213 Mass. 103, 106. *Ansell* v. *Boston*, 254 Mass. 208, 210–211. *Zoulalian* v. *New England Sanatorium & Benevolent Association*, 230 Mass. 102.

As matter of strict and abstract verbal interpretation, apart from context, circumstances, and contemporary and antecedent history, the language of G. L. c. 234, § 1, is broad enough to comprise women. The word "person" when used in an unrestricted sense includes a woman. It has been said that "The word 'persons,' in its natural and

usual signification, includes women as well as men." *Opinion of the Justices*, 136 Mass. 578, 580. *Binney* v. *Globe National Bank*, 150 Mass. 574. "The natural and obvious meaning of the word 'person' is a living human being." *Sawyer* v. *Mackie*, 149 Mass. 269, 270. *Madden* v. *Election Commissioners of Boston*, 251 Mass. 95, 98. The word "person," like many other words, has no fixed and rigid signification, but has different meanings dependent upon contemporary conditions, the connection in which it is used, and the result intended to be accomplished. It has been said to be "an ambiguous word" and may refer to those of either or both sexes. *Nairn* v. *University of St. Andrews*, [1909] A. C. 147, 162. Reference *re* meaning of word "Persons," 1928 Canada Sup. Ct. 276, 286, 288, 303. *Edwards* v. *Attorney General for Canada*, [1930] A. C. 124, 143. The word "person" may include a national bank, *Central National Bank* v. *Lynn*, 259 Mass. 1, 14; a corporation, *McDonnell* v. *Berkshire Street Railway*, 243 Mass. 94, 95; a society, association or partnership, *Commissioner of Corporations & Taxation* v. *Cooperative League of America*, 246 Mass. 235, 238; *Commonwealth* v. *Rozen*, 176 Mass. 129, 131. Yet it was held not to include corporations upon the facts in *Commonwealth* v. *Phoenix Bank*, 11 Met. 129, 149. Notwithstanding Pub. Sts. c. 3, § 3, Sixteenth, (G. L. c. 4, § 7, Twenty-third) to the effect that the word "person" in construing statutes shall include corporations, it was held not thus inclusive in *Steel Edge Stamping & Retinning Co.* v. *Manchester Savings Bank*, 163 Mass. 252. It has also been held not to include a woman. *Mashburn* v. *State*, 65 Fla. 470, 474. Several cases have arisen where the question was whether the word "person," when used respecting the right to hold office or to exercise the franchise, included women. In *Nairn* v. *University of St. Andrews*, [1909] A. C. 147, it appeared that, by Acts of Parliament of 1868 and 1881, the university franchise was conferred upon "every person" whose name was on the register and on whom degrees had been conferred. At that time women were not admitted to graduation and could not receive degrees. In 1889, a further act was passed for the appointment of commissioners with extensive regulatory powers

over universities. These commissioners adopted an ordinance enabling the universities to confer degrees on women for satisfactory academic accomplishments. The appellants, having received degrees upon graduation, contended that they had the right to vote. In rejecting that contention, it was said by Lord Loreburn, at page 161: "It proceeds upon the supposition. that the word 'person' in the Act of 1868 did include women, though not then giving them the vote, so that at some later date an Act purporting to deal only with education might enable commissioners to admit them to the degree, and thereby also indirectly confer upon them the franchise. It would require a convincing demonstration to satisfy me that Parliament intended to effect a constitutional change so momentous and far-reaching by so furtive a process. It is a dangerous assumption to suppose that the Legislature foresees every possible result that may ensue from the unguarded use of a single word, or that the language used in statutes is so precisely accurate that you can pick out from various Acts this and that expression and, skillfully piecing them together, lay a safe foundation for some remote inference." It was held that the statutory word "person" did not in these circumstances include women. It was held in *Viscountess Rhondda's Claim*, [1922] 2 A. C. 339, that an Act of Parliament passed in 1919, providing that "A person shall not be disqualified by sex or marriage from the exercise of any public function," did not entitle a peeress of the United Kingdom in her own right to receive the writ of summons to Parliament. Doubtless, as an abstract conception, it is a public function to sit in the House of Lords and to exercise the prerogatives of a member. But it was held by ten out of twelve law lords sitting in the case, among whom were the most eminent judges of the day, that the word "person" as used in the act could not rightly be interpreted to include women in those entitled to sit in the House of Lords. It was said by Lord Birkenhead in the course of an exhaustive statement reviewing many decisions, at page 369: ". . . a long stream of cases has established that general words are to be construed so as, in an old phrase, 'to pursue the intent of the makers of statutes'

. . . and so as to import all those implied exceptions which arise from a close consideration of the mischiefs sought to be remedied and of the state of the law at the moment, when the statute was passed." At pages 372–373, the words of Lord Loreburn in *Nairn* v. *University of St. Andrews,* [1909] A. C. 147, at pages 160, 161, to which reference has already been made, were quoted with high commendation.

This brief review of authorities demonstrates that "person" by itself is an equivocal word. Its meaning in a statute requires interpretation. The statute here under examination (G. L. c. 234, § 1) is a reënactment of a long line of statutes of the Commonwealth running back to a time shortly after the adoption of the Constitution as well as through all intermediate revisions dealing with qualifications for jury service. Laws of the Colony and of the Province are in effect the same. In the earlier and later statutes, the same essential and almost the identical words have been employed. The word "person" occurs in them all. The selection of jurors has constantly been required to be from those qualified to vote. Qualifications for voting have been continuously established by the Constitution. By the words of that instrument and its amendments (apart from the effect of the Nineteenth Amendment to the Federal Constitution) the right to vote was confined to male inhabitants, male persons, and finally to male citizens, until the word "male" was stricken out in 1924 by Amendment 68. See c. 1, § 2, art. 2; c. 1, § 3, art. 4; arts. 3 and 32 of the Amendments. Manifestly, therefore, the intent of the Legislature must have been, in using the word "person" in statutes concerning jurors and jury lists, to confine its meaning to men. That was the only intent constitutionally permissible. There is every presumption that the legislative department of government always intends to act strictly within the bounds of the Constitution. *Perkins* v. *Westwood,* 226 Mass. 268, 271. *Commonwealth* v. *S. S. Kresge Co.* 267 Mass. 145, 148, and cases collected. *Attorney General* v. *Brissenden,* 271 Mass. 172, 177.

Possession of property of specified value and payment of taxes, as qualifications for voters, were required in earlier

days and from time to time, but these were gradually eliminated by amendments to the Constitution until the last of such limitations disappeared with the approval of Amendment 32 in 1891. When the suffrage has been thus widened among male citizens, there has followed, without further legislation and without change in the phrase of the statute, a like extension of citizens liable to service as jurors. These concurring enlargements of those liable to jury service were simply an extension to larger numbers of the same classification of persons. Since the word "person" in the statutes respecting jurors meant men, when there was an extension of the right to vote to other men previously disqualified, the jury statutes by specific definition included them. No amendment to the statute can be conceived which could have made that meaning more clear. This is the force and effect of *Neal* v. *Delaware*, 103 U. S. 370, at page 389.

Changes in suffrage and in liability for jury service in the past differ in kind from the change here urged.

The Nineteenth Amendment to the Federal Constitution conferred the suffrage upon an entirely new class of human beings. It did not extend the right to vote to members of an existing classification theretofore disqualified, but created a new class. It added to qualified voters those who did not fall within the meaning of the word "person" in the jury statutes. No member of the class thus added to the body of voters had ever theretofore in this Commonwealth had the right to vote for candidates for offices created by the Constitution. The change in the legal status of women wrought by the Nineteenth Amendment was radical, drastic and unprecedented. While it is to be given full effect in its field, it is not to be extended by implication. It is unthinkable that those who first framed and selected the words for the statute now embodied in G. L. c. 234, § 1, had any design that it should ever include women within its scope. It is equally inconceivable that those who from time to time have reënacted that statute had any such design. When they used the word "person" in connection with those qualified to

vote for members of the more numerous branch of the
General Court, to describe those liable to jury service, no
one contemplated the possibility of women becoming so
qualified. The same is true in general of those who from
time to time reënacted the statute in substantially the
same words. No intention to include women can be de-
duced from the omission of the word male. That word
was imbedded in the Constitution of the Commonwealth
as a limitation upon those citizens who might become
voters and thereby members of a class from which jurors
might be drawn. It would have been superfluous also
to insert that word in the statute. The words of Chief
Justice Gray in *Robinson's Case*, 131 Mass. 376, at pages
380, 381, are equally pertinent to the case at bar: "When-
ever the Legislature has intended to make a change in the
legal rights or capacities of women, it has used words
clearly manifesting its intent and the extent of the change
intended. . . . In making innovations upon the long-
established system of law on this subject, the Legislature
appears to have proceeded with great caution, one step
at a time; and the whole course of legislation precludes
the inference that any change in the legal rights or capaci-
ties of women is to be implied, which has not been clearly
expressed."

The conclusion is irresistible that, according to sound
principles of statutory construction, it cannot rightly be
held that the scope of R. L. c. 176, § 1, the statute in force
on August 26, 1920, now G. L. c. 234, § 1, was extended
by the ratification of the Nineteenth Amendment so as to
render women liable to jury duty. To reach that result
would be directly contrary to every purpose and intent
of the General Court in enacting that law.

The same reasoning on which rests the conclusion just
stated requires without further discussion the holding that
the approval in November, 1924, of art. 68 of the Amend-
ments to the Constitution of this Commonwealth, whereby
the word "male" was stricken from the Constitution as de-
scriptive of citizens qualified to vote, did not operate to
extend the scope of G. L. c. 234, § 1, beyond its previous

limits so as to make women liable to jury service without
further legislative action.   An amendment to the Consti-
tution does not commonly alter the meaning and scope of
words in the body of statutory law.   The Constitution of
this Commonwealth contains no reference to the qualifica-
tions of jurors.   That subject is within the cognizance of
the General Court.

B.   The second argument of the defendant on this
branch of the case is that, since the General Laws were
enacted on December 22, 1920, (about four months sub-
sequent to the ratification of the Nineteenth Amendment)
the Legislature, although using the same essential words
theretofore used to describe those liable to service as jurors,
namely, "person qualified to vote for representatives to the
general court," must have intended to include women.

It is a general principle of statutory construction that
the reënactment of a statute in substantially the same words
does not change its meaning or extend its scope.   Its words
are presumed to continue to have attached to them the
same sense as in the preceding enactment.   *Main* v.
*County of Plymouth*, 223 Mass. 66, 69, and cases cited.
*Derinza's Case*, 229 Mass. 435, 442, 443.   *See* v. *Building
Commissioner of Springfield*, 246 Mass. 340, 343.   *Select-
men of Framingham* v. *Boston & Albany Railroad*, 268
Mass. 93, 96.   *Buck Stove & Range Co.* v. *Vickers*, 226
U. S. 205, 213.

It is permissible and important to examine proceedings
incident to the enactment of the General Laws to deter-
mine whether any alteration of meaning in this particular
was intended.   *Old South Association* v. *Boston*, 212 Mass.
299, 304–305.   *Loring* v. *Young*, 239 Mass. 349, 368, and
cases cited.   *Hood Rubber Co.* v. *Commissioner of Corpora-
tions & Taxation*, 268 Mass. 355, 358, and cases cited.
The Report of the Commissioners to Consolidate and
Arrange the General Laws, appointed pursuant to Res.
1916, c. 43, was submitted to the General Court on June 1,
1920, almost three months prior to the proclamation of
the ratification of the Nineteenth Amendment.   The
function of the commissioners as indicated by their name

was to deal with existing laws and to suggest changes but not to embody them in the draft submitted. That report contained a complete body of the statute laws, but no substantial change in preëxisting statutes concerning voting by women, and no change as to jury lists. It was referred to a joint special committee of the General Court. On June 2, 1920, St. 1920, c. 579, was approved. It was entitled "An Act to enable women voters to vote at primaries and elections when qualified." It was enacted in anticipation of the ultimate adoption of the Nineteenth Amendment, which had been ratified by resolution of the General Court in June, 1919. St. 1919, page 483. The joint special committee of the General Court submitted their report at a special session held in December, 1920. In that report it is stated that "The subcommittee to which was assigned the legislation of 1920 recommended that the laws relating to intoxicating liquors and woman's suffrage, affected by the eighteenth and nineteenth amendments to the Federal Constitution, be redrawn to conform to these amendments. The Committee voted to correct the laws as to suffrage and to leave the laws as to intoxicating liquors unchanged, which votes were respectively carried out."

The draft of the General Laws reported by the joint special committee shows that they conformed to this paragraph of their report and made changes touching the right of women to vote. See particularly notes appended to cc. 50, 51, 53, 54 and 56 of their report. They made no changes respecting women in any other particular. No change was made touching jury lists. They retained the provision now embodied in G. L. c. 123, § 57, requiring a jury of men to hear and determine the cases there classified. The General Laws were enacted on December 22, 1920, in substantially the form submitted by the joint special committee, so far as here material. It is most unlikely that the Legislature should, for the first time, require women to serve as jurors without making provision respecting the exemption of the considerable numbers of women who ought not to be required to serve as jurors, and without directing

that changes for the convenience of women be made in court houses, some of which are notoriously overcrowded and unfit for their accommodation as jurors.

Plainly, the joint special committee and the General Court in adopting the proposal of that committee had no thought of such a fundamental alteration in making jury lists and conducting jury trials as would be involved in rendering women liable to jury service. No intent of that nature can be imputed to them.

It may be observed in this connection that, pursuant to Res. 1923, c. 53, a special commission was appointed for an investigation of the subject of making women eligible for jury service. A report of that commission was duly made, but no legislative action has ever been taken in favor of such eligibility.

The conclusion is that, by the true construction of the statutes of this Commonwealth, in the light of relevant constitutional provisions, women are not eligible to jury service and that the preparation of the jury lists from which the jury in the case at bar were drawn from men alone was right.

The question of the effect of granting the suffrage to women on statutes providing for the selection of jurors from the members of the electorate has arisen in several States. The conclusion here reached is supported in principle by a respectable body of authority. *State* v. *Kelley*, 39 Idaho, 668. *Fyfe* v. *Barnett*, 319 Ill. 403. *State* v. *James*, 96 N. J. Law, 132. *In re Grilli*, 179 N. Y. Supp. 795, affirmed on opinion below in 192 App. Div. (N. Y.) 885. *State* v. *Mittle*, 120 S. C. 526; certiorari denied, 260 U. S. 705. *Tremont* v. *State*, 96 Tex. Cr. 572. *Harland* v. *Territory of Washington*, 3 Wash. Ter. 131. See *McKinney* v. *State*, 3 Wyo. 719, 723. There are decisions to the contrary. *State* v. *Walker*, 192 Iowa, 823. *Palmer* v. *State*, 197 Ind. 625. *Browning* v. *State*, 120 Ohio, 62. *Commonwealth* v. *Maxwell*, 271 Penn. St. 378. See *People* v. *Barltz*, 212 Mich. 580; *Parus* v. *District Court*, 42 Nev. 229; *State* v. *Chase*, 106 Ore. 263.

2. The contention of the defendant is that, by reason of the exclusion of women from the jury list, she has been

denied the equal protection of the laws contrary to the
guaranty contained in the Fourteenth Amendment to the
Federal Constitution. It hardly needs to be repeated
that no provision of a State constitution or statute in con-
flict with the paramount Constitution of the United States
as interpreted by the Supreme Court of the United States
has any validity. *Opinion of the Justices,* 234 Mass. 597,
607. *Florida* v. *Mellon,* 273 U. S. 12, 17. This contention
of the defendant in the main rests upon four decisions of
the United States Supreme Court concerning the mean-
ing and effect of the Thirteenth, Fourteenth and Fifteenth
Amendments, adopted shortly after the close of the war
between the States for the preservation of the Union,
with respect to the rights of the colored race. The scope
of those decisions can best be determined by certain quo-
tations from them. In *Strauder* v. *West Virginia,* 100 U. S.
303, the decision that denial by a State to colored citizens
of the right to serve on juries was a violation of the Four-
teenth Amendment of the United States Constitution
rested upon the underlying principle (pages 306, 307–308)
that "This is one of a series of constitutional provisions
having a common purpose; namely, securing to a race re-
cently emancipated, a race that through many generations
had been held in slavery, all the civil rights that the supe-
rior race enjoy. The true spirit and meaning of the amend-
ments, as we said in the *Slaughter-House Cases* (16 Wall.
36), cannot be understood without keeping in view the
history of the times when they were adopted, and the gen-
eral objects they plainly sought to accomplish. . . . To
quote the language used by us in the *Slaughter-House
Cases,* 'No one can fail to be impressed with the one per-
vading purpose found in all the amendments [Thirteenth,
Fourteenth and Fifteenth], lying at the foundation of
each, and without which none of them would have been
suggested, — we mean the freedom of the slave race, the
security and firm establishment of that freedom, and the
protection of the newly made freeman and citizen from
the oppressions of those who had formerly exercised
unlimited dominion over them.' . . . The words of the

amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race, — the right to exemption from unfriendly legislation against them distinctively as colored, — exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps toward reducing them to the condition of a subject race." In *Ex parte Virginia*, 100 U. S. 339, 344, 345, it was said, referring to Amendments Thirteen and Fourteen: "One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility of oppression by law because of race or color." To the same general end are *Virginia* v. *Rives*, 100 U. S. 313, 323, and *Neal* v. *Delaware*, 103 U. S. 370. The force and effect of those four decisions as to the causes leading to the proposal and ratification of those amendments, and the general intent to be accomplished by them, are not shaken or affected by later decisions such as *Maxwell* v. *Dow*, 176 U. S. 581, 591, and *Buchanan* v. *Warley*, 245 U. S. 60, 76, recognizing the Fourteenth Amendment as extending its protection to all persons, white or black, or corporations.

The intent and design of those amendments, as thus authoritatively declared, were utterly different from the reasons leading to the adoption of the Nineteenth Amendment. Giving to those four decisions the widest scope, they all rest expressly upon the purpose and effect of the Thirteenth, Fourteenth and Fifteenth Amendments with respect to a race, up to that time enslaved in several of the States but thereby created citizens, made freemen and clothed with full civil and political rights. They were transformed from slaves to citizens of a free nation. The situation under those amendments then confronting the persons theretofore held as slaves was utterly differ-

ent from that arising under the Nineteenth Amendment. Women had not been enslaved. They had been recognized as citizens and clothed with large property and civil rights. Woman has long been generally recognized in this country as the equal of man intellectually, morally, socially. Opportunities in business and for college and university training had been freely open to her. Education of the youth of the land had been largely entrusted to her. In many respects laws especially protective to women on account of their sex had been enacted. Most of those formerly imposing limitations, even upon married women with respect to property and business, had disappeared. Those were not changed by the Nineteenth Amendment. Current discussion touching the adoption of the Nineteenth Amendment related exclusively to the franchise. The words of that amendment by express terms deal solely with the right to vote. The underlying principles of those four decisions of the Supreme Court of the United States upon which the defendant relies and the reasoning on which they rest seem to us inapplicable to the present case. The statement in *Strauder* v. *West Virginia*, 100 U. S. 303, at page 310, seems to us still vital and apposite to the present case: "We do not say that within the limits from which it is not excluded by the amendment a State may not prescribe the qualifications of its jurors, and in so doing make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications." This conclusion is fortified by decisions of the Supreme Court of the United States holding that the denial to woman by State statutes or laws of the right to practice law, *Bradwell* v. *State*, 16 Wall. 130; *Lockwood, petitioner*, 154 U. S. 116, to vote (before the adoption of the Nineteenth Amendment), *Minor* v. *Happersett*, 21 Wall. 162, and to make contracts to perform labor by themselves more than specified numbers of hours within designated periods, *Muller* v. *Oregon*, 208 U. S. 412; *Riley* v. *Massachusetts*, 232 U. S. 671; *Miller* v. *Wilson*, 236 U. S. 373, violates no rights or privileges secured to women by the Fourteenth Amendment.

Those rights appear to us quite as essential to the privileges and immunities of citizens and equal protection of the laws as the duty to serve as jurors. As to contentions like those here urged by the defendant, it was said in *State* v. *James,* 96 N. J. Law, 132, at pages 136–137: "This constitutional guarantee, as to the right to jury trial, has been held to be trial by a jury at common law. . . . A common law jury consisted of 'twelve free and lawful men.' . . . Women could not serve as jurors at common law except upon a jury to try an issue under a writ *de ventre inspiciendo,* whether a woman be with child or not . . . A petit or traverse jury is a body of twelve *men.* . . ." Referring to the Nineteenth Amendment, at pages 138–139, it was said: "It will be observed that this part of the organic law makes no provision whatever about jurors. It emancipates women only so far as the right of suffrage is concerned, and leaves no impediment in the way of the legislature clothing them with capacity to become and serve as jurors; . . . But the amendment itself does not operate in terms or by implication to qualify women as jurors. It requires legislation to do that." Several of the authorities previously cited under 1, B, support this view.

The defendant places reliance in this connection upon *Neal* v. *Delaware,* 103 U. S. 370. In that case it appeared that a statute of Delaware provided that "All persons qualified to vote at the general election shall be liable to serve as jurors" with certain exceptions immaterial to the issues raised. The State court interpreted that statute to include colored persons upon and after the adoption of the Fifteenth Amendment. It was in that connection that the Federal Supreme Court said, at page 389: "Beyond question the adoption of the Fifteenth Amendment had the effect, in law, to remove from the State Constitution, or render inoperative, that provision which restricts the right of suffrage to the white race. Thenceforward, the statute which prescribed the qualifications of jurors was, itself, enlarged in its operation, so as to embrace all who by the State Constitution, as modified by the supreme law of the land, were qualified to vote at a general elec-

tion . . . . (page 393)   The discrimination complained of does not result from the Constitution or laws of the State, as expounded by its highest judicial tribunal."   We interpret that to mean that the Supreme Court adopted with distinct approval the construction of the State statute placed upon it by the highest judicial authority of the State. Its established procedure, according to our understanding, is to accept the determination of the State court as to the scope and effect of a statute of that State.   *St. Louis & Kansas City Land Co.* v. *Kansas City*, 241 U. S. 419, 427. *Crew Levick Co.* v. *Pennsylvania*, 245 U. S. 292, 294.   *Broad River Power Co.* v. *Daniel*, 281 U. S. 537, 540, 541.   In any event, we are unable to perceive any conflict between that decision and the conclusion we feel constrained to reach.   As already pointed out in this opinion, the word "person" without further limiting phrase can hardly be construed to include only a part of the male citizens within the jurisdiction qualified to vote.   The decision in *Neal* v. *Delaware*, 103 U. S. 370, goes no further than that.

The reasons heretofore stated are conclusive, in our opinion, against the contention that there has been violation of the Act of Congress approved March 1, 1875, 18 U. S. Sts. at Large, 336, § 4, to the effect that "no citizen possessing all other qualifications . . . prescribed by law shall be disqualified for service as . . . juror in any court . . . of any State, on account of race, color, or previous condition of servitude . . . ."

Other Federal grounds, if any, set forth in the challenge to the array have not been argued.   They are therefore waived.   *Commonwealth* v. *Dyer*, 243 Mass. 472, 508, and cases cited.   *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 205.

We think that the defendant has not been deprived of the equal protection of the laws guaranteed to her under the Fourteenth Amendment to the Federal Constitution.

3. For the reasons already stated, we are of opinion that the defendant has had a trial by the judgment of her peers in conformity to the requirement of art. 12 of the Declaration of Rights of the Constitution of this Commonwealth.   She has been tried by a jury selected accord-

ing to the standing and valid laws of the Commonwealth and according to the principles of the common law. That is all that is guaranteed by art. 12. Before the ratification of the Nineteenth Amendment, no question could have been made as to the jurors. The same rules still prevail in this Commonwealth, and they afford women the same constitutional rights and protection as hitherto.

4. Police officers were allowed to testify to their own observations touching the tenement occupied by the defendant when they were in it, and as to the number and condition as to sobriety of persons going to and coming from it. All this testimony was pertinent to the crime charged in the complaint of keeping intoxicating liquor for sale. It need not be narrated or summarized. There was no error of law in its admission. *Commonwealth* v. *Kozlowsky*, 243 Mass. 538, and cases cited. *Commonwealth* v. *Helfman*, 258 Mass. 410.

Various questions put by the defendant to a police officer as to his reasons for not arresting intoxicated men whom he saw leaving the defendant's house, for not making a complaint against the defendant for manufacturing intoxicating liquor, and as to the impression he desired to convey, were rightly excluded. They had no bearing upon the guilt of the defendant or the credibility of the witness. Another police officer gave competent testimony in answer to a question not calling for the answer. At the conclusion of the answer, counsel for the defendant prayed the judgment of the court and the judge said: "Admitted." The question was proper. If the defendant had desired to have the answer stricken out as irresponsive, she should have made motion to that effect. *Commonwealth* v. *Johnson*, 199 Mass. 55, 60. There is no merit in any of the exceptions as to the admission or exclusion of evidence. No further discussion of them is required. *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 386.

5. There was no error in the denial of numerous requests for rulings made by the defendant. There was evidence sufficient to support a verdict of guilty. The motives of the officers in conducting the raids on premises of the de-

fendant were immaterial on the question of the guilt of the defendant. So far as that matter affected the credibility of witnesses, it was adequately covered by the charge. The other requests need not be examined in detail. So far as they directed attention to matters requiring treatment in the charge, they were adequately and fairly dealt with. The charge was complete, accurate, and impartial, and it covered all the issues raised. There was no error in the manner in which the trial was conducted by the presiding judge. *Commonwealth* v. *Caruso*, 251 Mass. 362, 368. All the exceptions argued have been considered and discussed so far as necessary.

*Exceptions overruled.*