William V. IRONS

v.

The RHODE ISLAND ETHICS
COMMISSION et al.

Nos. 2008–335–M.P., 2009–1–M.P.

Supreme Court of Rhode Island.

June 29, 2009.

John Tarantino, Esq., Providence, for Plaintiff.

Jason M. Gramitt, Esq., Katherine D'Arezzo, Esq., for Defendant.

Present: FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

**O P I N I O N**

Justices FLAHERTY, ROBINSON, and Chief Justice WILLIAMS (ret.) for the Court.

"The purpose of the speech in debate clause is to ensure the Legislature freedom in carrying out its duties.

" * * *

"This freedom ensures the separation of powers among the coordinate branches of government. Further, the fact that the legislators can carry out their duties without being questioned 'in any other place' allows the free flow of debate among legislators and the maximization of an effective and open exchange of ideas." *Holmes v. Farmer*, 475 A.2d 976, 982 (R.I.1984).

The case before us presents this Court with an unusual constitutional conundrum: at the heart of the controversy are two conflicting constitutional provisions, the purpose of each of which is to serve the proper functioning of our representative democracy. One of the long-acknowledged purposes of the Rhode Island Constitution's speech in debate clause, article 6, section 5, is the protection of individual legislators from encroachment by the coordinate branches of government and from legal challenges by disgruntled citizens; but, the legislators are garbed with such protection only while engaged in carrying out their core legislative duties. To the framers of the various constitutions, the

public is the ultimate beneficiary of this narrow protection because the speech in debate clause assures an unfettered legislative process. The limited but important immunity conferred by this constitutional provision exists, in the words of Thomas Jefferson, "in order to give to the will of the people the influence it ought to have * * *."[1]

At the same time, our Constitution contains another provision that is pertinent to the case before us—namely, section 8 of article 3. That provision mandates the establishment of an ethics commission and the adoption of a code of ethics by the General Assembly and then states that "[a]ll elected and appointed officials * * * shall be subject to the code of ethics."

It is now our solemn duty to determine the applicability of these two constitutional provisions to the case at bar.

## I

### Facts and Travel

On January 20, 2004, Robert P. Arruda and Beverly M. Clay filed a written complaint with the Rhode Island Ethics Commission (Ethics Commission) against the then-president of the Rhode Island Senate, William V. Irons (Senator Irons).[2] The complainants, the chair and vice chair, respectively, of Operation Clean Government (an organization that describes itself as "dedicated to promoting honest, responsible, and responsive state government")

alleged that, despite being faced with conflicts of interest, Senator Irons had participated wrongfully in debate and had voted on certain legislation affecting companies with which he had a business relationship. Although the record is sparse with respect to the precise nature of Senator Irons's alleged conflicts of interest, it is evident that Senator Irons participated in legislative acts concerning pharmacies while at the same time maintaining as his private clients companies with strong ties to the pharmaceutical industry.

In its essence, the complaint filed by Mr. Arruda and Ms. Clay alleged that, because Senator Irons, who at all relevant times was an insurance broker, had a pecuniary relationship with CVS, Inc. (a major pharmacy retailer) and with Blue Cross & Blue Shield of Rhode Island (a health insurer), he acted improperly when he voted against the Pharmacy Freedom of Choice legislation in 1999 and 2000.[3] Specifically, the complainants alleged that Senator Irons acted wrongfully by "deliberat[ing], consider[ing], and otherwise participat[ing] in a governmental decision to affect pharmacy issues, while he was paid significant commissions by Blue Cross & Blue Shield of Rhode Island, the provider of the CVS health-insurance plan covering more than 5,000 employees in Rhode Island." The complainants also asserted that Senator Irons had failed to file the requisite statement of conflict of interest forms,[4] had

1. 8 Works of Thomas Jefferson 322–23 (1797), reprinted in 2 The Founders' Constitution 336 (Philip B. Kurland & Ralph Lerner eds., 1987).

2. The Rhode Island Ethics Commission (Ethics Commission) is a constitutionally established nonpartisan body that was created to adopt, enforce, and administer the Code of Ethics as set forth in G.L. 1956 chapter 14 of title 36. The Ethics Commission was "formed to oversee ethics in State Govern-

ment." *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 3 (R.I. 1992).

3. The Pharmacy Freedom of Choice legislation would have allowed consumers to choose the pharmacy at which they could fill their prescriptions; a consumer's insurer would not be allowed to restrict his or her choice of pharmacy to those designated by the insurer.

4. Section 36–14–6 provides, in relevant part, that:

failed to file with the Ethics Commission the requisite financial statement,[5] and had failed to disclose income received from either CVS, Inc. or Blue Cross & Blue Shield of Rhode Island.[6]

The Ethics Commission determined that the complaint alleged "facts sufficient to constitute a knowing and willful violation" of the Code of Ethics; and on March 3, 2004, the Commission officially informed Senator Irons that it would investigate the allegations in the complaint. *See* G.L. 1956 § 36–14–12(c)(1). After making the initial determination that the facts alleged in the verified complaint were sufficient to state a cause of action, the Ethics Commission conducted a preliminary investigation to determine whether probable cause existed to support the allegations set forth in the complaint. (According to § 36–14–

12(c)(3), if probable cause does not exist, the charges must be dismissed.)

A probable cause hearing was held on November 9, 2004. After conducting an investigation in accordance with the above-referenced statutory mandate, the Ethics Commission issued an order and finding of probable cause for two counts of the complaint, and it dismissed the remaining three counts.[7] The Ethics Commission found that probable cause did exist with respect to: (1) the allegation that Senator Irons had a substantial conflict of interest when he participated in the Senate Corporations Committee's consideration of pharmacy choice legislation in the 1999 and 2000 legislative sessions; and (2) the allegation that Senator Irons used his public office to obtain financial gain for CVS, his client, during the same legislative ses-

---

"Any person subject to this code of ethics who, in the discharge of his or her official duties, is or may be required to take an action, make a decision, or refrain therefrom that will or can reasonably be expected to directly result in an economic benefit to the person, or spouse (if not estranged), or any dependent child of the person, or business associate or any business by which the person is employed or which the person represents, shall, before taking any such action or refraining therefrom:

(1) Prepare a written statement sworn to under the penalties for perjury describing the matter requiring action and the nature of the potential conflict; if he or she is a member of a legislative body and he or she does not request that he or she be excused from voting, deliberating, or taking action on the matter, the statement shall state why, despite the potential conflict, he or she is able to vote and otherwise participate fairly, objectively, and in the public interest; and

(2) Deliver a copy of the statement to the commission, and:

(i) If he or she is a member of the general assembly or of any city or town legislative body, he or she shall deliver a copy of the statement to the presiding officer of the body, who shall cause the statement to be recorded in the journal of the body and, upon request of the member, may excuse the member from votes, deliberations, or any other action on the matter on which a potential conflict exists * * *."

**5.** Section 36–14–16 requires all state elected officials to file an annual financial statement with the Ethics Commission.

**6.** Section 36–14–17 sets forth the disclosures required in the financial statement.

**7.** The Ethics Commission dismissed, for want of probable cause, the following three counts alleged in the complaint: (1) "by acting as the insurance broker for [Blue Cross & Blue Shield of Rhode Island's] provision of health insurance coverage to CVS employees while participating in the Senate Corporations Committee's consideration of Pharmacy Freedom of Choice legislation in the 1999 and 2000 legislative sessions, [Senator Irons] * * * violated [§ 36–14–5(b)]"; (2) in failing "to file a notice of recusal with the Commission and the Senate, * * * [Senator Irons] violated [§ 36–14–6]"; and (3) in failing "to disclose any income received from [Blue Cross & Blue Shield of Rhode Island] or CVS on annual financial disclosure statements, * * * [Senator Irons] violated [§ 36–14–17]."

sions.[8]

The record before this Court reflects that it was not until April 13, 2007, that there was another filing with the Ethics Commission; on that date, Senator Irons demanded a jury trial pursuant to article 1, sections 10 and 15, of the Rhode Island Constitution.[9] On November 6, 2007, Senator Irons filed a motion seeking dismissal of the remaining two counts in the complaint; those counts alleged violations of §§ 36–14–5(a) and (d).[10] The motion to dismiss was predicated on Senator Irons's contention that prosecution pursuant to those counts would violate the speech in debate clause, article 6, section 5, of the Rhode Island Constitution. Later that month, the Ethics Commission held a hearing on both the motion to dismiss and the demand for a jury trial. On November 28, 2007, the Ethics Commission denied both Senator Irons's motion to have the

---

**8.** It should be noted that, on March 11, 1999, Senator Irons had written a letter to the Ethics Commission concerning "an issue soon to come under consideration by [him] in [his] role as a Rhode Island Senator." In that letter, Senator Irons explained that he was an independent insurance broker and that a bill was before the senate in which one of his clients had an interest. He went on to state that, despite his client's interest in the bill, the pending legislation "would in no way modify the compensation structure of [his] business contract with that client." Senator Irons closed the letter with a request for an advisory opinion concerning his participation in the referenced legislation, and he assured the Ethics Commission that he would answer any additional questions that would assist in their determination of the issue. After reviewing Senator Irons's letter, the Ethics Commission responded to him in a letter indicating that he could participate and vote on the pending legislation because his client would be no more or less affected by the legislation than any other similarly situated individual or group; the letter further stated that public policy considerations weighed in favor of Senator Irons's participation in the legislative process.

The Attorney General, in an amicus brief filed with this Court in connection with the *instant case, suggested that because of the* above-referenced advisory letter from the Ethics Commission to Senator Irons, we need not reach the constitutional issues implicated by this case. Although we appreciate the Attorney General's insightful suggestion, and we are troubled by the existence of this advisory opinion, which appears to allow the very acts for which Senator Irons now stands accused, we ultimately are convinced that, because the underlying issue presented is one of immunity, whereas the existence of the advisory opinion presents Senator Irons with a potential *defense* before the Ethics Commission, we must address the issue of immunity at this juncture—since immunity bestows a right "not to stand trial or face the other burdens of litigation * * * rather than [being] a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Bergeron v. Cabral*, 560 F.3d 1, 5 (1st Cir.2009) (Selya, J.).

**9.** Article 1, section 10, of the Rhode Island Constitution guarantees that "[i]n all criminal prosecutions, accused persons shall enjoy the right to a speedy and public trial, by an impartial jury."

Section 15 explains the importance of the right to a jury trial and provides that "[t]he right of trial by jury shall remain inviolate."

**10.** Section 36–14–5(a) reads:
"No person subject to this code of ethics shall have any interest, financial or otherwise, direct or indirect, or engage in any business, employment, transaction, or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, as defined in § 36–14–7."
Section 36–14–5(d) reads:
"No person subject to this code of ethics shall use in any way his or her public office or confidential information received through his or her holding any public office to obtain financial gain, other than that provided by law, for him or herself or any person within his or her family, any business associate, or any business by which the person is employed or which the person represents."

outstanding allegations in the complaint dismissed as well as his demand for a jury trial.

On December 13, 2007, Senator Irons filed a complaint in the Superior Court, in which he contended that the Ethics Commission improperly had denied his motion to dismiss as well as his demand for a jury trial.[11] His arguments to the Superior Court were similar to those that he had made before the Ethics Commission: *viz.*, (1) that the protection afforded to him by the speech in debate clause rendered him immune from prosecution with respect to the above-referenced counts; and (2) that, if he was not immune, he had a constitutional right to a jury trial. After a hearing with respect to these two issues in the Superior Court, the hearing justice granted Senator Irons's motion to dismiss the remaining two counts. In so ruling, he held:

> "[P]ast legislative acts performed by [Senator] Irons are prohibited from inquiry by the Speech in Debate Clause. Consequently, the Ethics Commission is constitutionally precluded from questioning [Senator] Irons about those acts."

The hearing justice also addressed Senator Irons's claim of a right to a jury trial, and he concluded that the senator was not so entitled because the Ethics Commission proceedings involved the adjudication of public rights, which type of adjudication he held falls within a recognized exception to the right to be tried by jury.

The Ethics Commission thereafter petitioned this Court for a writ of certiorari in order to obtain review of the Superior Court's ruling relative to the speech-in-debate issue, and Senator Irons cross-petitioned for a writ of certiorari with respect to his right to a jury trial. We granted both petitions and issued writs of certiorari.

## II

### Analysis

■ When reviewing the issues raised in a writ of certiorari, this Court conducts a *de novo* review with respect to all applicable questions of law. *Henderson v. Newport County Regional Young Men's Christian Association*, 966 A.2d 1242, 1245–46 (R.I.2009); *see also Crowe Countryside Realty Associates, Co., LLC v. Novare Engineers, Inc.*, 891 A.2d 838, 840 (R.I.2006); *Matter of Falstaff Brewing Corp. re: Narragansett Brewery Fire*, 637 A.2d 1047, 1049 (R.I.1994). When conducting such review, "[w]e do not weigh the evidence * * *, but only conduct our review to examine questions of law raised in the petition." *Henderson*, 966 A.2d at 1246 (quoting *Crowe*, 891 A.2d at 840).

■ The speech in debate clause, found in article 6, section 5, of the Rhode Island Constitution, provides: "For any speech in debate in either house, no member shall be questioned in any other place." The plain and unequivocal language of the clause "confers a privilege on legislators from inquiry into their legislative acts or into the motivation for actual performance of legislative acts that are clearly part of the legislative process." *Holmes v. Farmer*, 475 A.2d 976, 983 (R.I.1984).[12] It is on the

---

**11.** In his complaint in the Superior Court, Senator Irons named as defendants the Ethics Commission, as well as James Lynch, Sr., Barbara Binder, George Weavill, Jr., Frederick K. Butler, Ross E. Cheit, Richard Kirby, James V. Murray, and James C. Segovis, all in their official capacities as members of the Ethics Commission.

**12.** The importance of this Court's decision in *Holmes v. Farmer*, 475 A.2d 976 (R.I.1984), to our reasoning with respect to the instant case cannot be over-emphasized. The controversy

basis of this constitutional provision that Senator Irons claims immunity from an enforcement action by the Ethics Commission.

The Ethics Commission, however, argues that sections 7 and 8 of article 3 of the Rhode Island Constitution (referred to as the Ethics Amendment) created a narrow exception to the speech in debate clause. According to the Ethics Commission, those provisions authorize it to investigate and pursue enforcement actions against legislators for suspected violations of the Code of Ethics—even regarding their core legislative acts.

Speech-in-debate immunity is a venerable and important product of historical travails (and their resolution) in England that occurred long before the events of 1776, but that immunity was most definitely embraced by this country once independence was achieved. This Court previously has detailed the history of this privilege, and we have noted that it was asserted by members of the English Parliament as early as 1455, with its first known written appearance found in the Speaker's Petition of 1542. *Holmes*, 475 A.2d at 981, 981 n. 8. The importance of the privilege was not lost on the founders of this nation; it was

separately included in the Articles of Confederation as well as in the constitutions of several states; and eventually it was included in the United States Constitution, in which it was included with "virtually no debate." *Id.* at 982. The language of the speech in debate clause of this state, included in our first written constitution in 1842,[13] as well as that of the similar provision in the United States Constitution, was derived from the English Bill of Rights of 1689—a milestone in the centuries-long power struggle between the Parliament and the monarchy. *Holmes*, 475 A.2d at 981–82; *see also Tenney v. Brandhove*, 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). More recently, the electorate of this state *reaffirmed* the speech in debate clause, when, in 1986, the voters adopted a neutral rewrite of the then-existing provisions of the Rhode Island Constitution.[14]

The speech in debate clause "protects the institution of the Legislature itself from attack by either of the other co-equal branches of government." *Holmes*, 475 A.2d at 985. Further, this Court has expressly stated that one of the purposes of the speech in debate clause is "to protect individual legislators 'from executive and judicial oversight that realistically threat-

that gave rise to that litigated case eventually resulted in a particularly scholarly opinion by now-retired Justice Donald Shea, which opinion constitutes especially powerful precedent for the present Court.

13. In the leading case of *Tenney v. Brandhove*, 341 U.S. 367, 374 n. 3, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the United States Supreme Court noted that Connecticut and Rhode Island provided for the privilege "in the first constitutions enacted [in 1818 and 1842 respectively] to replace their uncodified organic law."

14. The entire text of the constitution (including the speech in debate clause) was attached to a handbook distributed by the 1986 Constitutional Convention to voters before the 1986 election. The handbook was entitled "Con-

vention Alert: Constitution Rewrite and Resolutions Approved by the 1986 Rhode Island Constitutional Convention." The first resolution, "A Resolution Relating to A Neutral Rewrite of the Constitution," specifically noted that adoption of the neutral rewrite of the constitution would not *"change the intent of any section."*

Likewise, the "Voter's Guide to Fourteen Ballot Questions For Constitutional Revision," also released by the Constitutional Convention of 1986, noted: "The 1986 Convention has approved a rewritten version of the Constitution that deletes the language cancelled by amendments or court decisions, but *makes no substantive changes* in the Constitution." (Emphasis in original.)

ens to control his conduct as a legislator.' " *Id.* (quoting *Gravel v. United States,* 408 U.S. 606, 618, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)). In addition, it should go without saying that, because the speech in debate clause "ensure[s] the Legislature freedom in carrying out its duties," the people are the intended and ultimate beneficiaries. *See id.* at 982.

■ As this Court noted previously—invoking the wisdom of the nation's earliest published case interpreting the legislative privilege—the privilege exists "not with the intention of protecting the members [of the Legislature] against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office, without fear of prosecutions, civil or criminal." *Holmes,* 475 A.2d at 982 (quoting *Coffin v. Coffin,* 4 Mass. 1, 27 (1808)); *see also United States v. Brewster,* 408 U.S. 501, 507, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."). Without fear of encroachment by the coordinate branches of government or by legal challenges brought by disgruntled citizens, the people's representatives may engage in "the free flow of debate among legislators and the maximization of an effective and open exchange of ideas." *Holmes,* 475 A.2d at 982. Indeed, the legislative privilege serves as but one of many constitutional checks and balances that ensure that the General Assembly can perform its duties without encroachment from the other branches. *Id.*

■ This Court has interpreted the speech in debate clause to provide legislators with "absolute" immunity from questioning "by any other branch of government for their acts in carrying out their legislative duties relating to the legislative process." *Holmes,* 475 A.2d at 983; *see also Marra v. O'Leary,* 652 A.2d 974, 975 (R.I.1995). We wish to stress in the strongest possible terms, however, that it in no way grants a legislator the right to transgress the Code of Ethics or any other law. Legislators are held accountable for violations of the Code of Ethics, and they are not immune for actions which violate that code. The only exceptions are those in which the speech in debate clause of the constitution is implicated. The immunity afforded merely precludes the Ethics Commission from prosecuting within a narrow class of *core legislative acts.* Actions of legislators "in proposing, passing, or voting upon a particular piece of legislation" are core legislative acts that fall "clearly within the most basic elements of legislative privilege." *Holmes,* 475 A.2d at 984. In short, "as long as [a legislator's] challenged actions, stripped of all considerations of intent and motive, were legislative in character, the doctrine of absolute legislative immunity protects them from such claims." *Maynard v. Beck,* 741 A.2d 866, 870 (R.I.1999).

■ Activities that remain unprotected by this immunity include, but are not limited to: speeches delivered outside of the legislature; political activities of legislators; undertakings for constituents; assistance in securing government contracts; republication of defamatory material in press releases and newsletters; solicitation and acceptance of bribes; and criminal activities, even those committed to further legislative activity. *Holmes,* 475 A.2d at 983; *see also Hutchinson v. Proxmire,* 443 U.S. 111, 127–28, 133, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *United States v. Helstoski,* 442 U.S. 477, 489, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979); *Gravel,* 408 U.S. at 621

n. 12, 92 S.Ct. 2614; *Brewster*, 408 U.S. at 512, 92 S.Ct. 2531.

Here, the actions of Senator Irons, as alleged in the Ethics Commission's complaint, were, as the parties both agree, core legislative acts. Senator Irons participated in debate, considered legislation affecting pharmacies, and voted, in both 1999 and 2000, to oppose legislation denominated as the Pharmacy Freedom of Choice Act. These are precisely the activities concerning which the Ethics Commission has charged him.

Although the actions of Senator Irons, as alleged in the Ethics Commission's complaint, fall within the ambit of the speech in debate clause, the Ethics Commission argues that the Ethics Amendment created a narrow repeal of the speech in debate clause by implication, allowing the Ethics Commission to pursue an enforcement action against the Senator for alleged violations of the Code of Ethics.

■ The Ethics Amendment, like the speech in debate clause, was not the product of a vacuum but rather of specific historical circumstances. In 1992, the then Justices of this Court acknowledged in *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 11 (R.I. 1992),[15] that, prior to the amendment's adoption "widespread breaches of trust, cronyism, impropriety, and other violations of ethical standards decimated the public's trust in government." In response, an ethics committee was created as part of the 1986 Constitutional Convention to con-

---

15. Because our dissenting colleague relies heavily on *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1 (R.I. 1992), we pause to note that this Court has long held that "while an advisory opinion rendered by this court is entitled to respect, it is advisory only, and without weight as legal precedent." *Romeo v. Cranston Redevelopment Agency*, 105 R.I. 651, 656, 254 A.2d 426, 430 (1969). In rendering an advisory opinion, the Justices of this Court "do not speak *ex cathedra*, from the chair of judgment, but only as consultors somewhat like the jurisconsults under the Roman law. However sound the opinion may be, it carries no mandate. For this reason it is not an exercise of our judicial power." *Opinion to the Governor*, 93 R.I. 262, 264, 174 A.2d 553, 554 (1961). In accordance with what has long been our practice, we look for primary precedential guidance to this Court's opinions stemming from litigated cases, rather than to opinions that are merely advisory. We conclude that binding precedent does exist to answer the particular question posed to us—namely, *Maynard v. Beck*, 741 A.2d 866 (R.I.1999), *Marra v. O'Leary*, 652 A.2d 974 (R.I.1995), and *Holmes v. Farmer*, 475 A.2d 976 (R.I.1984).

This Court is not alone in viewing advisory opinions as lacking in the sort of precedential value that would trigger the doctrine of *stare decisis*. For example, the Supreme Judicial Court of Massachusetts unanimously wrote as follows in *Commonwealth v. Welosky*, 276 Mass. 398, 177 N.E. 656 (1931):

"When the same questions [as had earlier been the subject of our advisory opinion] are raised in litigation, the justices then composing the court are bound sedulously to guard against any influence flowing from the previous consideration, to examine the subject anew in the light of arguments presented by parties without reliance upon the views theretofore expressed, and to give the case the most painstaking and impartial study and determination that an adequate appreciation of judicial duty can impel." *Id.* at 658.

Moreover, we conclude that the 1992 advisory opinion, while helpful to set forth a factual background for the Ethics Amendment, does not usefully guide our decision in this case. In the 1992 advisory opinion, the then-sitting Justices of this Court (none of whom are presently members of this Court) opined that the Ethics Amendment gave the Ethics Commission an affirmative grant of power which therefore implied a limitation on the General Assembly with respect to enacting ethics legislation. In this instance, of the two diametrically opposed constitutional provisions we are attempting to reconcile, we cannot make the inference, based on our rules of constitutional construction as explained *infra*, that the Ethics Amendment similarly implies a limitation on the speech in debate clause.

sider effective measures of ethical reform. *Id.* at 2. The ethics committee recommended that an independent nonpartisan ethics commission with sweeping powers should be created to adopt a code of ethics and oversee ethics in state and local government. *Id.* at 3. The state's electorate approved these recommendations, and they were codified in article 3 of the Rhode Island Constitution. They provide as follows:

> "Section 7. Ethical conduct.—The people of the State of Rhode Island believe that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsive, avoid the appearance of impropriety and not use their position for private gain or advantage. Such persons shall hold their positions during good behavior."

> "Section 8. Ethics commission— Code of Ethics.—The general assembly shall establish an independent non-partisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure. All elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics. The ethics commission shall have the authority to investigate violations of the code of ethics and

to impose penalties, as provided by law; and the commission shall have the power to remove from office officials who are not subject to impeachment."

■■■■ In support of its contention that the Ethics Amendment created a narrow exception to the speech in debate clause, the Ethics Commission points to the language in section 8 of article 3, which section states that "All elected and appointed officials * * * shall be subject to the code of ethics." There is no doubt that a frequently cited canon of constitutional interpretation counsels against creating an exception to a constitutional provision when the plain language of that provision does not expressly provide for exception. *See* Chester James Antieau, *Constitutional Construction* 32 (1982). As Chief Justice John Marshall observed, "It would be dangerous in the extreme to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation." *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 202, 4 L.Ed. 529 (1819). Thus, our conundrum: the language of both provisions is unequivocal and absolute, neither admits of any exceptions. Significantly, there is no indication in the language of the Ethics Amendment that it was intended to abrogate speech-in-debate immunity, and we are resolutely disinclined to abridge such a long-standing and widely accepted constitutional provision in the absence of an express and uncontroverted manifestation of electoral intent.[16]

---

**16.** We respectfully part company with our dissenting colleague's focus on what he believes to be the underlying *intent* of the Ethics Amendment. When faced with clear language, a court need not and should not concern itself with what may have been the intent of the drafters or of the electorate. *See McKenna v. Williams,* 874 A.2d 217, 232 (R.I. 2005) ("When a constitutional provision is clear, it speaks for itself. In the face of a

clear constitutional provision (assuming it does not lead to absurd results), it is not necessary to anguish over what might have been the intent of the electorate."); *Davis v. Hawksley,* 119 R.I. 453, 455, 379 A.2d 922, 923 (1977); *see generally Connecticut National Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). In this case, we have two clear constitutional provisions; it is our responsibility to attempt

Moreover, neither provision is appreciably more specific than the other; thus we cannot hold, as would be proper if one were more specific, that the more specific provision prevails over the less so. *See Felkner v. Chariho Regional School Committee*, 968 A.2d 865, 870 (R.I.2009) ("When confronted with competing statutory provisions that cannot be harmonized, we adhere to the principle that the specific governs the general * * *.") (internal quotations omitted).[17] Nor can we rely on the maxim of constitutional construction that the later-enacted amendment is preferred over the earlier, because the Ethics Amendment and the preexisting provisions were both voted on and approved by the people on the same day.

We conclude, as we must, that both constitutional provisions at issue are specific, unequivocal, do not allow for any exception, and both were affirmed by the voters on the same day. Yet, they stand in diametrical opposition to each other. We cannot accept an invitation to read into the Ethics Amendment an unexpressed repeal of such an ancient and venerable hallmark of our form of government as is the immunity provided in the speech in debate clause without a clear and explicit directive for such an exception in the language of the Ethics Amendment itself. Because no such language is present, we decline to recognize any partial repeal of speech-in-debate immunity.

Because we hold that the Ethics Amendment does not create an exception to the speech in debate clause and, because the alleged actions of Senator Irons were core legislative acts entitled to speech-in-debate immunity, we hold that the Ethics Commission may not question him with respect to those acts. We do not accept the Ethics Commission's argument that such a holding on our part emasculates the entire Code of Ethics with respect to members of the General Assembly. Indeed, the Ethics Commission remains responsible to enforce the Code of Ethics against legislators when they are engaged in activities other than core legislative activities. As this Court previously has indicated, any claims of speech-in-debate immunity "going beyond what is needed to protect legislative independence are to be closely scrutinized." *Holmes*, 475 A.2d at 983 (quoting *Hutchinson*, 443 U.S. at 127, 99 S.Ct. 2675).

We wish to emphasize that this decision is predicated on our respect for the speech-in-debate immunity—a right that is expressly guaranteed by our constitution and that is widely recognized in this country and most of the English-speaking world. Unquestionably, this right could be modified (or even obviated) by a sufficiently explicit constitutional amendment—but we perceive no such explicitness in the language of the 1986 Ethics Amendment. If the citizens of Rhode Island wish to empower the Ethics Commission to inves-

to reconcile those two provisions in such a way that neither will be devoid of all meaning.

Even if we were to attempt to discern the intent of the framers, apart from the language employed in the text, in order to resolve this constitutional conundrum, we could not. There is no evidence in the minutes of the 1986 Constitutional Convention that the ethics committee researched, reviewed, or discussed the effect of the proposed Ethics Amendment on other constitutional provi-

sions. Similarly, we are not aware of any basis upon which we could intelligently divine the intent of the electorate.

**17.** Though the case cited in the text involves statutory (as opposed to constitutional) interpretation, we recently noted that the same analytic principles often apply when interpreting our constitution. *See In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council)*, 961 A.2d 930, 935 n. 6 (R.I.2008).

tigate and prosecute legislators with respect to their legislative actions, notwithstanding the operation of the speech in debate clause, they most certainly have the power to do so.

Having decided that Senator Irons is immune from prosecution under the speech in debate clause, we need not, and therefore do not, reach the issue of whether he has the right to be tried by a jury. Senator Irons contends that the violations with which he is charged (essentially, misconduct by a public official and conflicts of interest) existed when the state constitution was adopted and were considered criminal in nature at that time, therefore affording him the right to be tried by jury. The Ethics Commission, on the other hand, maintains that because this Court adopted the public-rights doctrine in *National Velour Corp. v. Durfee*, 637 A.2d 375, 379 (R.I.1994), exempting the adjudication of public rights from the jury-trial requirement, Senator Irons has no right to be tried by a jury.

Although we do pause to note that Senator Irons has presented a formidable argument to support his position contending that the public-rights doctrine may not apply, we shall leave the analysis of that argument for another day—in keeping with our long-standing policy of not reaching constitutional issues that prove unnecessary for the disposition of the case at bar. *See, e.g., In re Brown*, 903 A.2d 147, 151 (R.I.2006) ("Neither this Court nor the Superior Court should decide constitutional issues unless it is absolutely necessary to do so."); *Mathieu v. Board of License Commissioners, Town of Jamestown*, 115 R.I. 303, 307, 343 A.2d 1, 3 (1975) ("While there may be some merit in petitioner's argument that [the statute] is unconstitu-

tional, we will consider such a contention only where determination of such an issue is dispositive of the case before us."); *State v. Berberian*, 80 R.I. 444, 445, 98 A.2d 270, 270–71 (1953) ("[T]his court will not decide a constitutional question raised on the record when it is clear that the case before it can be decided on another point and that the determination of such question is not indispensably necessary for the disposition of the case."); *see generally Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Hudson Savings Bank v. Austin*, 479 F.3d 102, 106 (1st Cir.2007).

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court with respect to its ruling as to the applicability of the speech in debate clause in the Rhode Island Constitution. It not being necessary to do so, we express no opinion with respect to the Superior Court's ruling on the jury trial issue.[18] The record may be remanded to the Superior Court.

Justice SUTTELL, dissenting.

Although I concur with much of the majority's analysis concerning the two conflicting constitutional provisions at issue in this appeal, I respectfully disagree with its ultimate conclusion.

As the majority cogently articulates, speech in debate immunity has long been an integral protection enjoyed by legislative bodies in the common-law tradition, one that plays a vital role in ensuring the independence of the Legislature. *See Holmes v. Farmer*, 475 A.2d 976, 982 (R.I. 1984) (the speech in debate clause enables

---

**18.** We would like to express our gratitude to the *amici curiae* for the helpful and informa-

tive briefs submitted to this Court.

representatives to execute the core legislative functions of their office without fear of civil or criminal prosecution and ensures the separation of powers among the coordinate branches of government); *see also United States v. Brewster*, 408 U.S. 501, 516, 525, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). Without question, the speech in debate clause, codified in article 6, section 5, of the Rhode Island Constitution, has a rich and storied history. Its roots can be traced back as far as 1455, amidst the bitter and protracted dispute between Parliament and the English Crown. *See Holmes*, 475 A.2d at 981 nn. 8 & 9. It perhaps most famously found expression in the English Bill of Rights of 1689, adopted during the Glorious Revolution that marked the demise of the Stuart monarchy. *See* Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L.Rev. 1113, 1129–30 (1973).

I might quibble with the majority's assertion that "[t]he plain and unequivocal language of the clause 'confers a privilege on legislators from inquiry into their legislative acts or into the motivation for actual performance of legislative acts that are clearly part of the legislative process.' *Holmes*, 475 A.2d at 983." Rather, I believe, the full breadth of the privilege largely has been shaped by case precedent. As the United States Supreme Court has explained,

> "prior cases have plainly not taken a literalistic approach in applying the privilege. The Clause * * * speaks only of 'Speech or Debate,' but the Court's consistent approach has been that to confine the protection of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view. Committee reports, resolutions, and the act of voting are equally covered; '[i]n short, * * * things generally done in a session of the House by one of its mem-

bers in relation to the business before it.'" *Gravel v. United States*, 408 U.S. 606, 617, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972) (extending the privilege to legislative aides) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1881)).

In either case, the privilege is firmly established in this jurisdiction. In *Holmes*, 475 A.2d at 981, this Court's first opportunity to interpret and apply the speech in debate clause of the Rhode Island Constitution, the Court explained that it would look to "the interpretation of a similar provision in the United States Constitution." The *Holmes* Court then carefully delineated the scope of the speech in debate clause under the Rhode Island Constitution stating:

> "The speech in debate clause contained in Rhode Island's Constitution confers a privilege on legislators from inquiry into their legislative acts or into the motivation for actual performance of legislative acts that are clearly part of the legislative process. * * * Legislators should not be questioned by any other branch of government for their acts in carrying out their legislative duties relating to the legislative process. We go no further at this time than to hold that the speech in debate clause limits judicial inquiry into words or actions that are clearly a part of the legislative process." *Id.* at 983.

In the case at bar, as the parties have acknowledged, the actions for which former Senator Irons stands accused fall squarely within the ambit of the speech in debate clause.

Nevertheless, it is an immutable principle of our constitutional government that the people retain the right to amend their constitution. The very first section of the Rhode Island Constitution declares that

" 'the basis of our political systems is the right of the people to make and alter their constitutions of government.' " R.I. Const. art. 1, sec. 1. In 1986, the people of this state exercised this right by substantially altering our constitution, most significantly by the adoption of the ethics amendment, codified as sections 7 and 8 of article 3 of the Rhode Island Constitution. It is my opinion that the ratification of this amendment fundamentally changed the structure of government in order to achieve a framework for more responsible and accountable governance. As the majority properly recognizes, the language of the ethics amendment is indeed plain and unequivocal: "All elected and appointed officials * * * shall be subject to the code of ethics." R.I. Const. art. 3, sec. 8.

At the same time, however, the people reaffirmed the speech in debate clause. I agree with the majority that the ethics amendment and the speech in debate clause are two conflicting constitutional provisions. If both are accorded their broadest readings, neither can flourish to their fullest extents. Because repeals by implication are disfavored by the law, we make every effort to harmonize statutory and constitutional provisions to avoid implied repeals. *In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council)*, 961 A.2d 930, 935–36 n. 7 (R.I. 2008) (*CRMC*); *see also Such v. State*, 950 A.2d 1150, 1156 (R.I.2008). Harmoniza-

tion, however, is not possible in this case; I share the majority's view that the two provisions "stand in diametrical opposition to each other." Accordingly, these provisions being irreconcilably repugnant, one provision must necessarily bend to the other. The majority resolves this conundrum by declining "to abridge such a long standing and widely accepted constitutional provision in the absence of an express and uncontroverted manifestation of electoral intent." By doing so, however, it perforce vitiates the applicability of the ethics amendment to legislators with respect to their performance of legislative activities, contrary to the plain and unambiguous language of the ethics amendment. In essence, the majority chooses to accord greater import to "an ancient and venerable hallmark of our form of government" than to the more newly minted ethics amendment.[19]

I would take a different approach to this vexing constitutional dilemma by employing the principles of constitutional interpretation this Court has repeatedly applied, over a span of decades, with little or no variation in our methodology. As we explained in *Riley v. Rhode Island Department of Environmental Management*, 941 A.2d 198, 205 (R.I.2008):

"In construing provisions of the Rhode Island Constitution, our 'chief purpose is to give effect to the intent of the framers.' " *In re Advisory Opinion*

---

**19.** In my opinion, it is not for this Court to decide the best framework for our state government; it is the province of this Court to effectuate the framework of government that the people intended to create. We have previously declared,

"Even to the shock and dismay of constitutional theoreticians, the people may add provisions dealing with 'non-fundamental' rights, as well as provisions bearing the most tenuous of relationships to the notion of what constitutes the basic framework of

government. * * * In altering their constitution, the question of '[h]ow power shall be distributed by a state among its government organs is commonly, if not always, a question for the state itself.' " *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 15 (R.I.1992) (*Ethics Commission*) (quoting *Omaha National Bank v. Spire*, 223 Neb. 209, 389 N.W.2d 269, 275 (1986) and *Highland Farms Dairy, Inc. v. Agnew*, 300 U.S. 608, 612, 57 S.Ct. 549, 81 L.Ed. 835 (1937)).

to *[the]* Governor *(Ethics Commission)*, 612 A.2d 1, 7 (R.I.1992) (citing *State ex. rel. Webb v. Cianci*, 591 A.2d 1193, 1201 (R.I.1991)); *Bailey v. Baronian*, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978); *Opinion of the [Justices] Court to the House of Representatives*, 45 R.I. 289, 293, 120 A. 868, 870 (1923). The historical context is important in determining the scope of constitutional limitations because " 'a page of history is worth a volume of logic.' " *In re Advisory Opinion to the Governor*, 688 A.2d 288, 291 (R.I.1997) (quoting *Kass v. Retirement Board of Employees' Retirement System*, 567 A.2d 358, 360 (R.I.1989) and Justice Oliver Wendell Holmes in *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). Therefore, this Court properly consults extrinsic sources, including 'the history of the times and examine[s] the state of affairs as they existed when the constitution was framed and adopted.' *[City of Pawtucket v.] Sundlun*, 662 A.2d [40,] 45 [(R.I.1995)] (citing *In re Advisory Opinion to the Governor*, 612 A.2d at 7).

"We 'employ the well-established rule of construction that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning.' *Sundlun*, 662 A.2d at 45 (citing *In re Advisory Opinion to the Governor*, 612 A.2d at 7). Moreover, 'every clause must be given its due force, meaning and effect and that no word or section must be assumed to have been unnecessarily used or needlessly added,' and we must 'presume the language was carefully weighed and its terms imply a definite meaning.' *In re Advisory Opinion to the Governor*, 612 A.2d at 7 (quoting

*Kennedy v. Cumberland Engineering Co.*, 471 A.2d 195, 198 (R.I.1984) and *Bailey*, 120 R.I. at 391, 394 A.2d at 1339)."

In 1993, five justices of this Court responded to a question propounded by the Governor concerning the authority of the ethics commission to adopt a code of ethics vis-à-vis the plenary legislative power of the General Assembly, which power also had been reaffirmed by the 1986 electorate. *See* R.I. Const. art. 6, sec. 10 (repealed 2004). I find their advisory opinion, albeit nonbinding, to be very persuasive with respect to the issue presented in this appeal.[20] In that case, the justices noted that "the electorate voted overwhelmingly to approve the ethics amendment" and that the task then before the Court was "to determine precisely the effect of that particular constitutional amendment." *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 7 (R.I.1992) (hereinafter *Ethics Commission*). We are confronted with a similar task in this appeal.

The justices began their analysis by stating our well established rule that "[i]n construing constitutional amendments, our chief purpose is to give effect to the intent of the framers." *Ethics Commission*, 612 A.2d at 7. They noted that in so doing it is proper to consult extrinsic sources, including the proceedings of the constitutional convention itself. *Id.* In addition, they cited the long-standing principle expounded by the United States Supreme Court in *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 723, 9 L.Ed. 1233 (1838) that "[i]n the construction of the constitution, we must look to the history of the times, and examine the state of things existing when it was framed and adopted * * *."

**20.** Although a nonbinding opinion, the justices in *Ethics Commission* were applying precedentially established rules of constitu-

tional construction consistently applied by this Court.

*See also Bailey v. Baronian,* 120 R.I. 389, 391–92, 394 A.2d 1338, 1339 (1978). In *Ethics Commission,* 612 A.2d at 2, the justices undertook a comprehensive examination of the history of the times and concluded:

"[T]he years preceding this state's 1986 constitutional convention were marked by scandal and corruption in both state and local government. As a result the overwhelming majority of Rhode Island's citizens were at the very least distrustful of their elected and appointed officials and of government as a whole. In response to public outcry for reform at all levels of government, an ethics committee was set up as part of the constitutional convention and given the task of examining unethical governmental conduct and proposing measures to bring about ethical reform that would ultimately restore the public trust."

Observing that the delegates who compose a constitutional convention are agents of the people " 'and as such derive their power and authority solely from the people,' " *Ethics Commission,* 612 A.2d at 7, the *Ethics Commission* justices reviewed the proceedings of the 1986 constitutional convention to gain "valuable insight into the intent of the framers * * *." *Id.* at 9–10. In doing so, they cited the following comments from the transcript of an ethics committee meeting held on May 22, 1986:

"Delegate Gelch: [T]he tragedy of what we have to do here is that we have to leave the implementation of a code of ethics to the thoughts [*sic*] [fox] guarding the chicken coop because once again, it's the old statement we all love our legislature, but we don't—when we look at the whole legislature, we don't trust the legislature.

"Delegate Philips: I think we should require all of those to follow a detailed code of ethics which we would *require*

the conflict of interest commission or successor agency to draft, promulgate, and implement.

"* * *

"Delegate Lacouture: Maybe some of our concerns can be resolved if instead of relying on the structure to come up with the code of ethics or the prohibition—let this commission do that.

"Delegate Milette: You know, that's a new idea, and I like it * * *. [W]e would direct that a code of ethics be developed * * * *[T]he code of ethics will be developed, and put the responsibility on the Conflict of Interest Commission instead of on the state legislature.* Now that takes the fox away from the chickens * * *. What I would like to see is to make sure it just doesn't die at the table, that it gets passed on to a responsible body which we would spell out to make the code of ethics become a reality. *Now if we are all concerned about the state legislature doing it or doing it right, let's take it away from them. Let's give it to another body.*" *Id.* at 10.

Based on their review of the convention records, the justices concluded that the primary intent of the framers "was to empower the [ethics] commission with the authority to develop a code of ethics, to investigate violations, and to enforce its provisions, always subject to review by the judicial branch of government consistent with the Constitution." *Id.* at 10–11.

The justices then analyzed the history of the times and the state of things as they existed when the constitution was framed and adopted in 1986. *Ethics Commission,* 612 A.2d at 11. They noted the "scandal and corruption at all levels of government" that preceded the convention, stating "widespread breaches of trust, cronyism, impropriety, and other violations of ethical standards decimated the public's trust in government." *Id.* Based on their analy-

sis, the justices concluded that "the basic motivating factor in enacting the ethics amendment was to restore the public's trust in government * * *." *Id.* at 11–12.

Noting that "it is permissible to examine election-brochure arguments in construing a constitutional amendment adopted by popular vote," *Ethics Commission,* 612 A.2d at 8, the justices also considered the voters' guide that was sent to each voter household prior to the electorate's approval of the ethics amendment. The guide detailed fourteen resolutions that were to be presented to the voters, including Question 6, which provided in pertinent part:

"ETHICS IN GOVERNMENT * * * Shall an ethics commission be established with authority to adopt a code of ethics and to discipline or remove public officials and employees found in violation of that code? * * *

"B. *Ethics Commission:* The general assembly would be directed to establish a non-partisan ethics commission that would enforce a code of ethics for all public officials, state and local, elected and appointed. The commission would have power to investigate charges, impose penalties and to remove officials who are not subject to impeachment * * *." *Id.* at 12.

The justices also noted that the ethics resolution as it appeared on the ballot provided in pertinent part:

"(b) The General Assembly shall establish an independent nonpartisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure. *All elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics."* *Id.* (emphasis added).

Although the language that was presented to the voters neither adds nor detracts from the plain and unambiguous language of the ethics amendment itself, it at least reinforces the understanding that the intent of the framers was to make the code of ethics applicable to all elected and appointed officials, including members of the General Assembly.

The issue addressed by the justices in *Ethics Commission* concerned the power conferred by the ethics amendment upon the ethics commission to enact ethics laws vis-à-vis the plenary legislative power of the General Assembly. In 1992, commission opponents averred that the General Assembly was not divested of its power to enact substantive ethics laws, notwithstanding the ethics amendment, because the electorate reaffirmed a constitutional provision continuing the plenary legislative powers of the General Assembly, formerly found in article 6, section 10, of the Rhode Island Constitution.[21] *Ethics Commis-*

---

21. The plenary power clause of the state constitution provided: "The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited by this Constitution." R.I. Const. art. 6, sec. 10 (repealed 2004). After ratification of the 1986 constitution, we construed this provision "to constitute a reaffirmation of the powers historically exercised by the Legislature under the prior constitution." *Kass v. Retirement Board of the Employees' Retirement System of Rhode Island,* 567 A.2d 358, 361 (R.I.1989). This provision has since been repealed as one of the constitutional changes effected by the Separation of Powers Amendments of 2004. *See* R.I. Const. art. 3, sec. 6; art. 5; art. 6, sec. 10 (repealed); and art. 9, sec. 5; *see also In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council),* 961 A.2d 930, 933 (R.I. 2008).

*sion,* 612 A.2d at 13–14. In answering this question, the justices concluded:

"In addition to reaffirming the plenary legislative power of the General Assembly, the 1986 electorate overwhelmingly approved the ethics amendment that was thereafter made part of the constitution in article 3, sections 7 and 8. We have ruled that the terms of article 3, section 8, expressly confer upon the commission the limited and concurrent power to enact substantive ethics laws. Accordingly, it logically follows that such an affirmative grant of power to the commission necessarily implies a limitation of the same on the part of the General Assembly or any other body. This is not to say, however, that the General Assembly is prohibited from enacting ethics laws altogether; rather, the General Assembly is merely limited to enacting laws that are not inconsistent with, or contradictory to, the code of ethics adopted by the commission." *Id.* at 14.

I believe an analogous conclusion is warranted in the case before us now.

In my opinion, it is clear from the analysis undertaken by the five justices of this Court in *Ethics Commission* that the primary concern of the framers and the electorate in 1986 was the ethical conduct of our public officials. As a result, the people of this state effected a dramatic change in the structure of government by mandating the creation of an independent, nonpartisan ethics commission and by clothing it with the extraordinary power not only to investigate allegations and impose penalties but also to "remove from office officials who are not subject to impeachment." R.I. Const. art. 3, sec. 8. However, the people also reaffirmed the speech in debate clause, a constitutional provision infused with a rich history signifying the advance of representative gov-

ernment and the decline of absolute monarchism in our Anglo–American tradition.

In *Holmes,* 475 A.2d at 982, this Court said, "[t]he purpose of the speech in debate clause is to ensure the Legislature freedom in carrying out its duties." The Court also quoted from *Coffin v. Coffin,* 4 Mass. 1, 27 (1808):

"These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office, without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered." *Holmes,* 475 A.2d at 982.

In 1986, the people of Rhode Island reaffirmed this principle. Yet at the same time they "overwhelmingly" adopted the ethics amendment that on its face applies to legislators. I would resolve this conundrum in a manner similar to that invoked by the five justices in *Ethics Commission* when they considered the conflict between the ethics amendment and the plenary powers clause and concluded that the ethics amendment impliedly limited the powers of the General Assembly. In light of the very specific intent of the framers to adopt a comprehensive ethics amendment and in view of the history of the times and the state of affairs in 1986, it is my opinion that the express application of the ethics amendment to "[a]ll elected * * * officials" necessarily implies a limitation on the full reach of the speech in debate clause. In other words, I would hold that in matters concerning the ethical conduct of legislators the ethics amendment creates a narrow exception to the immunity historically adhering to legislators in the performance of their legislative activities. Such a con-

struction of our constitution, I believe, gives greater effect to the intent of the convention delegates and electorate in 1986 than an interpretation that places legislators beyond the reach of the ethics commission for violations of the code of ethics with respect to their performance of legislative activities. It would also preserve the full measure of protections accorded legislators by the speech in debate clause as to questioning from any person or entity *except* the ethics commission.

For the reasons herein stated, I respectfully dissent from the Court's opinion.

Acting Chief Justice GOLDBERG did not participate.